NOVEMBER TERM, 1871.    269

State, ex rel. Love et al., v. Freeholders of Hudson Co.

THE STATE, EX REL. JAMES H. LOVE AND OTHERS, v. THE
BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY
OF HUDSON.

1. It is a point undetermined, in this state, how far on the question of the
existence of a public act, at a certain time, a court can inform itself,
by evidence outside of the date of the approval on the face of the act,
when it was signed. It is not settled by the case of *Gardner* v. *The
Collector, &c.,* 6 *Wall.* 499.
2. Elections should never be held void, unless clearly illegal.
3. When there is no question of fact in dispute, and the matter is of pub-
lic interest in relation to an office of short term, a peremptory *man-
damus* may properly issue.

In the case of *The State, Feurey, pros.,* v. *Charles J. Roe,*
(*ante* page 123,) there were two organizations, each claiming
to be the lawful board of chosen freeholders of the county of
Hudson. The court decided which of the two should be con-
sidered the lawful board. After that decision, the relators,
alleging that they had been lawfully elected as chosen free-
holders, under the act entitled " An act to provide for a board
of chosen freeholders in the county of Hudson," approved
April 6th, 1872, claimed membership as such, but were not
received by the board, on the ground that the election under
which the relators claim to have been chosen was invalid.

A rule for a *mandamus* to compel the board to admit them
as members, having been allowed, was argued at June Term,
1872, before Justices BEDLE, WOODHULL, and SCUDDER.

For the relators, *S. B. Ransom.*

For the defendants, *Wm. Brinkerhoff.*

BEDLE, J. This litigation, at the last term, assumed the
shape of a question which of two organizations was the legal
board of chosen freeholders of Hudson county. That mat-
ter, in the case of *The State, Feurey, relator,* v. *Roe,* was de-

cided in favor of the board against which this *mandamus* is now sought. After the opinion in that case, these relators were allowed this rule to show cause why the board should not admit them to seats therein. They claim to have been legally elected chosen freeholders in certain aldermanic districts of Jersey City, at a city election held April 11th, 1871 ; and that they were so elected under "An act to provide for a board of chosen freeholders in the county of Hudson," approved April 6th, 1871.

The city election was held under a new charter for Jersey City, approved March 31st, 1871 ; and the act of April 6th, 1871, provides for the election of chosen freeholders at such election—three (3) from each aldermanic district. Previous to the charter of 1871, freeholders from Jersey City were elected from wards. In that charter, wards were not recognized, but the city was divided into six (6) aldermanic districts. Without the act of April 6th, 1871, there was no provision for the election of freeholders from aldermanic districts, and it was not without question whether there was not an entire failure in the charter to fix any districts from which freeholders were to be elected. That question, however, need not now be decided. Attention will only be called to it in order to show the nature of the present difficulty before us.

Under the charter, the aldermanic districts were to be divided by the board of police commissioners into election precincts, each containing about three hundred (300) electors, as near as practicable ; and for each district the board was to appoint three judges and one clerk of election ; the election was to be held in the manner prescribed by law for conducting the *election of members of assembly*, so far as practicable ; and the powers and duties of such judges and clerk were to be the same as in such an election ; and in applying the laws which govern the election of members of the general assembly, and the statement and canvassing of the results thereof, *to a city election*, the board of city canvassers was to be substituted for the board of county canvassers, the clerks of election

State, ex rel. Love et al., v. Freeholders of Hudson Co.

for the clerks of townships, the city clerk for the county clerk, the office of the city clerk for the office of the county clerk, and the city hall for the county court-house. In all other respects, so far as practicable, the said laws were to be applied to the city election; and then followed this language: "And that for the purposes of any other election which, under any law of this state, should be held in said city, each election precinct shall be considered a township, and said judges and clerk of election shall be considered as township judges and clerk of election." Here are two provisions—one having special reference to a city election, so called; the other to any other election which, under any other law, should be held in the city—evidently having reference to what are known as the general elections, or such elections as should be held in said city by laws not peculiar to the city.

In a general election, the county canvassers meet at the court-house of the county, and are composed of members from the local districts whether townships, wards or precincts, and the relation of the judges and clerks of these local districts is with the board of county canvassers.

The primary object, no doubt, of the clause quoted, was to adapt the judges and clerk appointed by the police board to all other elections not peculiarly city elections, and to have them act in the same capacity as like officers of townships should. Perhaps, had the act of April 6th, 1871, not been passed, it might have been held that the words "for the purposes of any other election, each election precinct shall be considered a township," would have been sufficient to authorize an election of freeholders from such precincts, considering them as townships. That construction might have been a necessity, in order to prevent the city from being unrepresented in the board. Whatever the true construction of that clause may be, the act of April 6th, 1871, rendered it ineffective, so far as fixing the territorial limits from which freeholders should be elected. Freeholders from Jersey City are elected at the city elections in the same mode as city officers, and their election is canvassed and determined in the same

way—that is, according to the laws governing the election of members of the general assembly.

The question first involved is, whether the relators have sufficiently shown that they were elected according to the act of April 6th, 1871, in order to compel the board to admit them to seats. The board deny the legality of their election, on the ground that the election was not held according to that act, but that they were elected as freeholders from precincts, under color of the charter, and not from aldermanic districts, and that the election was, therefore, void. The act of April 6th, 1871, provided that until the persons to be chosen in accordance with that act shall be elected and qualified, the same persons who now are members shall be and constitute the board, and exercise all the rights and functions thereof. There are certain members from wards under the previous charter in Jersey City, who are now recognized by the board as holding over under that provision. The board passed a resolution May 1st, 1871, that having been advised that the election of freeholders, in Jersey City, was void, the members (meaning, no doubt, those from Jersey City,) would hold and retain their seats and perform the duties of the office until the whole matter be determined by a court of competent jurisdiction in the premises. Some of the members of the old board from Jersey City, it is admitted by these relators, were elected the same as they claim to be, and, therefore, no question is raised as to their seats. There are nine (9) members of the present board who are merely in the position of holding under the act of April 6th, without any color of an election on the 11th of April. On this application have the relators shown a sufficient right to be admitted to seats in the board? Under the laws governing the election of members of the legislature, the county canvassers must make two statements of the result of the election, each of which shall contain, among other things, "the names of all the persons for whom any vote or votes shall have been given for any office or offices to be filled by such election, and the whole number of votes which shall have been given for each person

for any such office or offices," &c., and shall particularly contain, &c., "the number of votes given in each township for each person," &c., which statements shall be certified, and one filed in the clerk's office of the county as an *official paper;* after which the board shall proceed to determine the person or persons who shall have been duly elected, &c., and make a statement and certificate thereof; which statement and certificate shall be annexed to the other statement which shall have been made, and delivered *therewith* to the county clerk, to be by him filed in his office as an *official paper.* This same kind of duties belongs to the city canvassers, and a statement and determination should be made by them in the same way, and filed in the city clerk's office as official papers. Both are of the same official character. One is the statement of the result in detail, the other is the official determination by the board of the persons who are elected, based upon the previous statement.

At the last term, it was held in the case of *Stokes* v. *The Freeholders of Camden*,[*] that the determination and certificate of the election of collector by the board of county canvassers, under a special act to elect a collector for the county, the same as a sheriff, were conclusive on *mandamus* against the board, and that the board was compelled to accept a sufficient bond from him. That determination would not be conclusive on *quo warranto*, but as against the board on *mandamus*, it was so held. That doctrine insures complete recognition of the adjudication of the board of canvassers, and, when made, gives certainty and harmony in the admission to office of the officers adjudged to be elected by the body whose duty it is primarily to determine it. At the same time the doctrine does not prevent an investigation into the result of an election on *quo warranto* whenever the court choose to allow it.

If the case before us stood on the mere determination of the board of city canvassers, that would also be held conclusive on this application, but it does not.

[*] *Ante p.* 217.

There is a determination of the persons elected at that city election, but as to the freeholders, it determines them as elected from each of the polling precincts in the aldermanic districts; that is its clear effect.   Instead of three (3) free-holders from each district, making eighteen from the six, thirty-nine (39) have been decided by the canvassers as elected, one from each precinct, and the precincts in each district raging from three to eight in number.   There can be no doubt that this is the determination of the canvassers, for in the case of John E. Cronham, one of the relators, who was voted for in all the precincts of the third district, and who had the greatest aggregate vote in the whole district, but not so in any particular precinct, is left out entirely, and those having the greatest number of votes in the precinct have been determined elected.   The conclusion of the canvassers as to the persons elected is made out on a wrong basis, not on the basis of three (3) for each aldermanic district, but one (1) for each precinct; as, for instance, in the First ward, eight (8) freeholders are declared elected when there should have been but three. (3).   The determination of the freeholders elected entirely ignores the act of April 6th, 1871.   It can have no effect whatever, so far as the freeholders are concerned, for, standing by itself, there can be no selection of any three of them as properly elected, and the basis upon which it is made out would exclude Cronham, who had the largest number of votes in this district.   Under these circumstances, the decision of the canvassers, as to the freeholders, must be declared void.   Had that been otherwise, and in favor of the relators as elected from aldermanic districts, the certificate of such decision would have been conclusive as against the board in this proceeding.   But with the certificate void, are officers, if properly elected, to be driven to a *mandamus* against the board to compel another certificate, or, if no such proceeding, is the only remedy by *quo warranto*, in order to get to the next best evidence of the election?   I think not.

The general statement is official, alike with the other, and they accompany each other.   If the canvassers have failed to do their duty in making the latter, I see no objection to the

court looking at the former to ascertain what its clear result may be. To require the official to bring a *mandamus* against the board, in all cases of failure to make the final determination, and then when made, to proceed by *mandamus* for admission to his office, as he would have to in case of refusal, would give persons in the mere attitude of holding over until others are elected, an advantage to keep such out of office, in most cases of minor offices, until the term had expired, and thereby defeat the popular will.

There is no principle requiring us to hold a rule with such consequences. I have no doubt that in some cases the court might refuse its aid to admit until the formal determination had been made, as in case of a complicated or indefinite general statement; but on failure of the best evidence of who were elected, I see no difficulty in the court resorting to the next official statement as the next best evidence, being that upon which the decision of the canvassers is based, and giving effect to the result, if it can be clearly discovered therefrom.

The case of *Prickett, Spencer* 134 has some inferences in favor of this conclusion. In 3 *Hill* 42, *ex parte Heath*, the canvassers having failed to decide who were elected, the other returns were looked to, and a *mandamus* allowed thereon. The true doctrine is, that if the determination of the statute has been made, it is conclusive against the board on *mandamus;* but if not, then, if the result can be clearly drawn from the other statement, it may be done, and should be held alike conclusive on *mandamus*—that is, to admit the officer in the first instance.

This brings us, then, to the question whether the other statement of the result shows the relators elected under the act of April 6th, 1871. That statement is a compliance with the election law. Although the canvassers have made their determination on the basis of a freeholder for each precinct, yet this first statement does not necessarily show that the election was conducted on that idea. A mistake of the canvassers in making their decision would not give the election the same character. The voting was obliged to be in election precincts. The statement gives the result in each aldermanic district;

as, for instance, it states "first aldermanic district;" then fol-
lows "for aldermen;" then the votes each person received in
the different precincts for that office; then comes "for chosen
freeholder," giving each precinct, as, for instance, "first
polling precinct," and under the head of each, the votes each
person received. All the returns for each person and office
are put down under the proper aldermanic district. This re-
turn will admit of a construction either that the person was
voted for as freeholder of the precinct, or that he had re-
ceived so many votes in the particular precinct. Whether
voted for as freeholder of the whole district, or for the pre-
cinct merely, the returns would be right either way, but the
persons elected would depend upon whether the count was
confined to the precinct or extended to the district.

The board of freeholders insist first, that the act of April
6th was not signed by the governor when the election took
place; and, secondly, whether signed or not, that the election
in fact was held under the charter, and not under the act of
April 6th, and therefore void.

The first objection involves a question undetermined in this
state—that is, how far on the question of the existence of a
public statute, at a certain time, the court can inform itself, by
evidence outside the date of the approval on the face of the
act, when it was signed. The opinion of the Supreme Court
of the United States, in the case of *Gardiner* v. *The Collector*,
6 *Wallace* 499, has this language: "We are of opinion,
therefore, on principle, as well as authority, that whenever a
question arises in a court of law of the existence of a statute,
or of the time when the statute took effect, or of the precise
terms of a statute, the judges who are called upon to decide
it have a right to resort to any source of information which
in its nature is capable of conveying to the judicial mind a
clear and satisfactory answer to such question—always seeking
first for that which in its nature is most appropriate, unless
the positive law has enacted a different rule." In the case
referred to, the statute was marked by the president approved
December 24th, and signed, but without any year, and the

court determined the year on the principles stated. The distinct question, how far the date may be shown otherwise than it actually appears on the face of the approval, was not squarely up under the facts of that case, and it is too important to be dealt with hastily. There has been no argument on it, and it should be left for future decision whenever it may arise. It is sufficient to say that in reference to the act of April 6th, there are no sources of information recognized by the case of *Gardiner* v. *The Collector*, of which the court are aware, that show the statute had no existence at the date of the approval, and the court therefore regard it as a law from April 6th, 1871. That being so, the election is presumed to have been held under it. The statement of the result is consistent with that view. Elections should never be held void unless clearly illegal. It is the duty of the court to give effect to them, if possible. This statement is conclusive, if from it can be clearly seen which three (3) persons voted for had the greatest number of votes in each of the aldermanic districts. There is no difficulty on that point. These eleven (11) relators appear on the face of the statement to have been elected according to the act of April 6th.

Another question is, whether the nine (9) members formerly elected from wards in Jersey City, and who occupy a like number of seats, which a like number of the relators should have, are to be considered as officers de facto in such a sense as that a *mandamus* to the board to admit the relators should not be allowed. The validity of their acts while holding their seats is a very different question. These nine (9,) as against their successors, only hold over until such are elected and qualified—if any other qualification than an election is necessary. Their right ends then, or, rather, when the term of those elected commences. If they remain in the board after that, it is only provisional against any vacancy. It is not like a contest about the title of an office covering the same regular term or period. The tenure in this case, of one, ends at the commencement of the other. The board has power to recognize its legal members, and to remove those who are

not—the same as any intruder. They may not always be able to tell who they are, but when found out, they can adjust their sittings accordingly. The *mandamus*, if issued to the board, can readily be obeyed by admitting the relators, then, they whose seats belong to the relators, *ipso facto*, become as strangers, subject to the direction of the board for the preservation of order.

If the returns were not sufficient on their face to show the relators elected, and a further investigation were necessary, the nine (9) might be allowed to continue in office until their right was settled on *quo warranto*. But when sufficient on their face, a mere provisional holding over should not make it necessary to bring a writ of *quo warranto*, unless we are prepared to hold that when resistance is made, the person so elected must get the office vacated by due process of law. In this case the board fairly desired to have the matter investigated, and I have no doubt of their ability and pleasure to obey the writ of the court, if issued.

The only remaining question is, as to the demand to be admitted. It is clear, from the official action of the board, that they did not intend to admit the relators till a decision was made of their right. Any formal demand was unnecessary, for the facts substantially amounted to a refusal. There being no question of fact in dispute, and the matter being of public importance, in relation to an office of short term, a peremptory *mandamus* should issue in favor of the relators (except such as decline) against the board of freeholders, to admit them as members.

Justices WOODHULL and SCUDDER concurred.

CITED *in State, Herder, pros.*, v. *Collector*, 7 *Vr.* 367; *O'Donnell* v. *Dusman*, 10 *Vr.* 684,